**SOUTH FERRY LP # 2, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**Kerry K. KILLINGER, Thomas W. Casey, Deanna W. Oppenheimer, William W. Longbrake, Craig J. Chapman, James G. Vanasek, and Washington Mutual, Inc., Defendants.**

Case No. C04–1599–JCC.

United States District Court, W.D. Washington, at Seattle.

Oct. 1, 2009.

Clifford A. Cantor, Sammamish, WA,
Kevin L. Oufnac, Michael A. Swick, Kahn

Gauthier Swick LLC, New Orleans, LA, Lori G. Feldman, Todd Kammerman, Milberg, New York, NY, Tamara J. Driscoll, Law Offices of Tamara J. Driscoll, Seattle, WA, for Plaintiff.

David L. Lansky, Barry M. Kaplan, Douglas W. Greene, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Mary Kay Vyskocil, Simpson Thacher & Bartlett, Candice Aloisi, Judith L. Mogul, Morvillo Abramowlitz Grand Iason Anello & Bohrer, PC, Cyrus R. Vance, Jr., Morvillo Abramowitz Grand Iason & Silberberg, PC, New York, NY, Robert J. Pfister, Simpson Thacher & Bartlett LLP, Los Angeles, CA, Steven P. Caplow, Davis Wright Tremaine, Robert M. Sulkin, McNaul, Ebel, Nawrot, Helgren & Vance, Seattle, WA, for Defendants.

## ORDER

JOHN C. COUGHENOUR, District Judge.

This matter comes before the Court on Defendants' reopened Motion to Dismiss Consolidated Amended Complaint (Dkt. No. 65), on remand from the Ninth Circuit (*see* Dkt. No. 155), and after a new round of supplemental briefing. (Individual Defendants' Joint Opening Brief on Remand (Dkt. No. 171); Plaintiffs' Opening Supplemental Opposition to Defendants' Motion to Dismiss (Dkt. No. 173), Plaintiffs' Reply (Dkt. No. 176), and Individual Defendants' Joint Response (Dkt. No. 174).) Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and will GRANT IN PART and DENY IN PART the motion to dismiss.

## I. BACKGROUND

### A. Factual Background: The Complaint

This case was first filed in 2004, before the housing market crashed, and before Washington Mutual, Inc. ("WaMu"), along with many of its sister institutions, declared bankruptcy. This matter spans a series of historic events, and provides a snapshot of the mortgage lending crisis that has shaken our country's economy. In order to distill the live issues and direct the parties' future efforts, the Court will describe the allegations and history of this matter in some detail—taking all of the well-pleaded allegations in the complaint to be true. *South Ferry LP, # 2 v. Killinger,* 542 F.3d 776, 782 (9th Cir.2008).

Plaintiffs'[1] Consolidated Amended Complaint ("the Complaint") alleges that WaMu and certain of its senior executive officers violated federal securities laws by issuing a series of materially false and misleading statements between April 15, 2003, and June 28, 2004 (the "Class Period"). The nub of the Complaint is that Defendants repeatedly represented to the investing public that (1) WaMu had successfully integrated the various technology platforms and operational processes from certain recent acquisitions, and that (2) WaMu was well positioned to withstand market changes in interest rates because of its hedging operations and the natural counterbalance of its risk. Plaintiffs assert that statements regarding WaMu's risk-management capabilities were materially false and misleading because WaMu had, in fact, *not* integrated its recent acquisitions, and, in particular, had failed to integrate these acquisitions' different in-

---

1. The lead plaintiffs seek to represent a class of investors who purchased and sold WaMu securities during the Class Period. They also sought to represent a class of investors who sold WaMu put options during the Class Period, but the Court found that the lead plaintiffs failed to allege loss causation as to their put options class and dismissed those claims. (MTD Order 40 (Dkt. No. 73).) This holding is not upset by the Ninth Circuit's vacatur.

formation technology systems. The latter failure, they claim, made it impossible for WaMu to be well positioned to withstand changes in the interest rate environment. (Compl. ¶ 39 (Dkt. No. 54–1 at 17).) In essence, the Complaint paints a portrait of a company whose ability to manage risk was seriously flawed, despite its officers' representations to the contrary.

WaMu maintained a mortgage lending business until its bankruptcy, and was the second-largest mortgage loan originator in the United States by April of 2003, after acquiring nearly $25 billion in assets through five separate acquisitions in 2001 and 2002. (Compl. ¶ 30 (Dkt. No. 54 at 10).) The Complaint focuses on two types of risk associated with WaMu's mortgage lending business: MSR-related risk and pipeline risk. When WaMu originated a home loan, WaMu typically retained the mortgage servicing rights (MSRs) on those loans, which allowed WaMu to provide billing and other services to mortgage holders. MSRs have independent value from the underlying loan-and they also have independent risk. The longer the loan exists, the more servicing fees the servicer can collect. If a loan recipient pre-pays its loans, the MSR decreases in value. MSR-related risk is greatest when interest rates are falling, because borrowers are more likely to refinance their loans to take advantage of cheaper rates.

Pipeline risk, on the other hand, is the risk that WaMu will commit to fund a loan at a certain interest rate, only to see market rates change by the time the loan is finalized. A borrower typically "locks in" an interest rate on her home mortgage several weeks before she actually closes a mortgage deal. When mortgage rates are falling, borrowers may abandon a lender with a loan in this so-called "pipeline" in order to take advantage of a cheaper loan elsewhere. When mortgage interest rates are *rising,* however, the borrower will be able to lock in rates that turn out to be below-market at the time of their closing— a loss for WaMu.

Both kinds of risk are therefore inherently subject to risk from market fluctuations in interest rates. WaMu managed these risks, in part, by relying on their "natural hedge." When rates are rising, pipeline risk increases, but MSR-related risk decreases; when rates are falling, the opposite occurs. Theoretically, this balance allowed WaMu to have a steadier revenue stream when interest rates fluctuated. (*See* Compl. ¶ 59 (Dkt. No. 54–1 at 28) (quoting CEO Killinger's description of this concept).) Additionally, WaMu's officials stated that the company hedged against risk through securities and derivative investments. (*Id.*) Plaintiffs allege that Defendants repeatedly assured investors that these hedging activities would allow WaMu to thrive in a volatile market.

According to Plaintiffs, however, WaMu was actually not prepared for, nor properly hedged against, a change in interest rates. The central theme of Plaintiffs' complaint is that WaMu's failure to integrate its information systems made it impossible for the company to monitor its hedges, including the "natural hedge," properly. (*See* Compl. ¶ 47 (Dkt. No. 54 at 21).) According to Plaintiffs, WaMu used "nine separate computer systems to originate mortgage loans, including systems used by acquired banks," and its attempt to implement a single integrated system, called Optis, was unsuccessful. (Compl. ¶¶ 39, 50–52 (Dkt. No. 54 at 16, 23–25).) Against this troubled backdrop, Plaintiffs allege that the individual Defendants[2] reassured investors by publicly

---

**2.** On October 14, 2008, WaMu filed for bankruptcy. (Dkt. No. 135.) All proceedings were therefore automatically stayed against WaMu. (*Id.*) The individual Defendants filed a report

on January 5, 2009, declaring that the litigation could proceed with respect to them. (Dkt. No. 142.) Because the applicable laws

downplaying the operating challenges and representing that WaMu was appropriately safeguarded against market volatility. Plaintiffs allege that these statements led investors to believe that WaMu was sufficiently aware of the interplay of its own risks—which, they allege, was impossible.

## B. Procedural Background

The Court first considered Defendants' Motion to Dismiss in an Order dated November 17, 2005, ("MTD Order") and granted in part and denied in part the Motion. (Dkt. No. 65 at 3.)

Under applicable standards announced in Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), the Securities and Exchange Commission ("SEC")'s Rule 10b–5, and the Private Securities Litigation Reform Act ("PSLRA"), Plaintiffs must properly plead five prongs to survive a motion to dismiss: (1) a misrepresentation of material fact, (2) scienter, (3) causation, (4) reliance, and (5) damages. *In re Daou Sys., Inc. Sec. Litig.*, 397 F.3d 704, 710 (9th Cir.2005). After a lengthy analysis, the Court in 2005 found that at least twenty-two statements alleged in the Complaint were actionably false and misleading misrepresentations of material fact, meeting the first prong of the analysis above. (MTD Order 23 (Dkt. No. 65).) As for the second prong, scienter, the Court decided that the allegations regarding Defendants' knowledge were sufficient to create a strong inference of scienter on the part of three out of the six individual named Defendants (Killinger, Oppenheimer, and Casey), but were not sufficient as to the other three (Chapman, Longbrake, and Vana-

sek). (*Id.* at 38). The Court then found that the Plaintiffs had adequately pleaded the third, fourth, and fifth prongs of a PSLRA claim.[3]

Defendants moved for reconsideration. (Dkt. No. 75.) In that motion, they sought to assign error to the Court's use of the core operations principle, discussed further *infra*, which is relevant to the scienter analysis (and to scienter alone). (*See id.* at 1.) Defendants argued that a recent Ninth Circuit decision, *In re Read–Rite Corp. Securities Litigation*, 335 F.3d 843, 848 (9th Cir.2003), disapproved of the principle, mandating a different result. The Court distinguished *Read–Rite* and denied the request for reconsideration, but also requested supplemental briefing on the issue of whether interlocutory appeal was appropriate. (*Id.* at 2–3.) After considering this briefing, the Court certified the issue of the continued viability of the core operations inference for appeal, because recent cases "provide substantial grounds for a difference of opinion as to the viability of the core operations inference." (Dkt. No. 96 at 4.)

The Ninth Circuit vacated the MTD Order and remanded. After clarifying the law on the core operations inference, the appellate court declined to uphold the complaint or to dismiss the action in its entirety—as urged by the respective parties—and instead remanded to this tribunal to "review Defendants' motion to dismiss under the appropriate standard." *South Ferry*, 542 F.3d at 786. In remanding on the issue of the core operations inference, the Ninth Circuit did not disturb the other

---

allow for individual liability without reference to their corporate employer, this Order does not violate the stay. *See* 15 U.S.C. § 78j(b) "It shall be unlawful for any *person,* directly or indirectly ... [t]o use or employ ... any manipulative or deceptive device or contrivance ..." (emphasis added); *see also Fin. Acquisition Partners, LP v. Blackwell,* 440

F.3d 278, 282 (5th Cir.2006) (discussing proceedings against individual defendants, where company was debtor in bankruptcy and subject to automatic stay).

**3.** The Court also discussed standing and Section 20(a), but those parts of the Order are not currently under review.

conclusions reached by the Court in the MTD Order. *Id.*

Accordingly, the scope of the current issue before the Court is quite narrow. The Ninth Circuit's opinion did not disturb the Court's prior determination that Plaintiffs had adequately pleaded the first, third, fourth, or fifth prong of the PSLRA analysis, so the Court re-adopts its holdings in the MTD Order on those points. To wit, Plaintiffs adequately alleged that WaMu made misrepresentations of material fact,[4] and have adequately pleaded causation, reliance, and damages; as before, the Motion to Dismiss is denied as to those elements. The only task before the Court is to reconsider whether Plaintiffs adequately pleaded scienter.

## II. APPLICABLE STANDARDS: PLEADING SCIENTER

Under Federal Rule of Civil Procedure 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. While a court must accept all material allegations in the complaint as true and construe them in the light most favorable to the nonmoving party, conclusory allegations of law or unwarranted inferences of fact urged by the nonmoving party are insufficient to defeat a motion to dismiss. *Ove v. Gwinn*, 264 F.3d 817, 821 (9th Cir.2001).

Although the Federal Rules of Civil Procedure generally require only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), federal securities laws add stricter pleading standards to the liberal notice pleading requirements. Like other types of fraud, securities fraud requires Plaintiffs to plead "specific facts" with particularity. *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999).

To plead scienter under the heightened pleading requirements imposed by the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), the Supreme Court held that a "strong inference" must be "cogent and compelling, thus strong in light of other explanations.... When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any competing inference?" *Id.* at 325, 127 S.Ct. 2499. Specifically, the Supreme Court held that a court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff ... but also competing inferences rationally drawn from the facts alleged." *Id.* at 314, 127 S.Ct. 2499.

---

4. Defendants spend a considerable amount of time discussing falsity, repeating that "plaintiffs have not adequately pleaded that defendants made a false statement about the company's core operations." (Def. Opening Br. 2:10–11 (Dkt. No. 171).) This argument bootstraps falsity into scienter in a way that is not endorsed by the Ninth Circuit. In fact, the bootstrap actually goes the other way—falsity *alone* can indicate scienter in a few extreme circumstances. *Digimarc*, 552 F.3d at 1000–01. As the Court previously found, "there is a substantial likelihood that a reasonable investor would have acted differently if WaMu had fully and fairly disclosed its progress or lack thereof in developing and/or integrating its technology platforms.... [A]ll the statements challenged by Plaintiffs meet the PSLRA test [for falsity]." (MTD Order 21–23 (Dkt. No. 73).) The individual Defendants' statements about WaMu's hedges and its technological integration were materially false and misleading, and pleaded with sufficient particularity; the Court will not revisit those conclusions.

The "required state of mind" for securities fraud is likewise settled. Scienter is the intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the Ninth Circuit, recklessness can meet the standard if it reflects "some degree of intentional or conscious misconduct," a concept that courts in this Circuit have called "deliberate recklessness." *South Ferry,* 542 F.3d at 782; *see also Silicon Graphics,* 183 F.3d at 979. More than this, the heightened pleading standards require more than "cheerful predictions that do not come to pass"; instead, the PSLRA demands "particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the statement was false when made." *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 989 (9th Cir.2008) (emphasis in original). Thus, in the context of a 12(b)(6) motion to dismiss, the Court must investigate whether Plaintiffs have alleged with sufficient particularity facts that "give rise to a strong inference" that Defendants made the materially false or misleading statements with at least deliberate recklessness as to their truth.

Of course, it is difficult to find facts regarding an adversarial party's state of mind, given that the only party in full knowledge of those facts is naturally disinclined to share them. As a consequence, Plaintiffs may point to either direct or circumstantial evidence to show that Defendants knew that their statements were false or misleading, but even the circumstantial allegations in the complaint must be strong and particular enough to withstand the PSLRA's heightened pleading requirements. *Silicon Graphics,* 183 F.3d at 974.

One tool in Plaintiffs' arsenal is the "core operations" inference. In the past, plaintiffs have attempted to satisfy the PSLRA's rigorous pleading standard by alleging not what a corporate officer *did* know, but what she *must have* known—namely, the mechanics of the business operations within the purview of her responsibilities. Under the core operations theory, it is reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operations of their companies. *See South Ferry,* 542 F.3d at 782. The question presented to the Ninth Circuit in the interlocutory appeal in this case was whether a scienter theory resting on a core operations inference satisfies the PSLRA's heightened pleading requirement. *Id.* at 783.

In *South Ferry,* the Ninth Circuit investigated the interaction of three cases considering the permissibility of this inference—*Read–Rite, Silicon Graphics,* and *Vantive*—and the recent Supreme Court decision in *Tellabs. Id.* The court acknowledged that the three appellate cases, "read *without* reference to *Tellabs,* will generally prevent a plaintiff from relying exclusively on the core operations inference to plead scienter under the PSLRA." *Id.* at 784 (emphasis added). *Tellabs,* however, cut the other way, suggesting that previous jurisprudence was "too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright." *Id.* Instead, *"Tellabs* counsels us to consider the totality of the circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *Id.*

The appellate court then announced three circumstances in which the core operations theory may come into play in meeting a plaintiff's pleading burden under the PSLRA. For simplicity's sake, the Court will call these three circumstances the "actual knowledge" analysis, the "absurdity" analysis, and the "holistic" analysis.

■ *The Actual Knowledge Analysis.* First, pleadings that rest on core operations theory may satisfy a plaintiff's pleading obligations when accompanied by particularized allegations that are sufficiently detailed to establish actual knowledge of the disputed information. *Id.* at 785. These must be "detailed and specific allegations about management's exposure to factual information within the company." *Id.* Facts that indicate that management *actually did* know of the core operations bolster an inference of scienter. *Id. In re Daou Sys., Inc.*, 411 F.3d 1006, 1022–23 (9th Cir.2005) and *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir.2004), fell into this category. *Id.* In *Daou*, the top executives had admitted that they were involved in "every detail" of the company and the plaintiffs had alleged that the defendants *actually did* monitor the data that were the subject of the allegedly false statements. *Daou*, 411 F.3d at 1022–23. Likewise, in *Oracle*, the CEO had touted that "[a]ll of our information is in one database. We know exactly how much we have sold in the last hour around the world." *Oracle*, 380 F.3d at 1231. Both of these allegations were sufficient to establish that the defendants had actual knowledge of the system flaws within the purview of their responsibilities within the company. *Id.* By contrast, allegations that senior management "closely reviewed the accounting numbers" and had quarterly meetings to discuss inventory was not enough to rise to the requisite level of scienter in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir.2009).

■ *The Absurdity Analysis.* The second category in which the core operations inference may be relevant to alleging scienter is those "rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* at 786 (in-

ternal quotation marks omitted) (*citing Applied Signal*, 527 F.3d at 988). In *Applied Signal*, for example, the corporation had categorized a substantial number of government contracts that were subject to "stop work" orders as "backlog"—or work that the company had contracted to do, but had not yet performed. *Applied Signal*, 527 F.3d at 984. Contrary to this categorization, however, "stop work" orders generally terminated the contracts entirely, making them unlikely ever to result in reportable income. *Id.* at 987. Because the individual defendants were "directly responsible for Applied Signal's day-to-day operations," it was "hard to believe" that they would not have known about orders that allegedly halted tens of millions of dollars of the company's work. *Id.* at 988.

Contrariwise, in *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008), the court rejected the contention that the CEO of a small company must have known about a discrete set of illegal payments by the company's foreign sales agents. *Id.* at 745. Instead, the court found it just as likely that the illegal payments had been kept secret, even within the company. *Id.* at 787. The court distinguished between information that the CEO "should have known" and information that he "must have known," as only the latter category demonstrates "intentional or conscious misconduct." *Id.* at 747–48. Finally, the court cautioned that "the mere fact that *someone* at [the company] had knowledge of the illegal transactions is not enough to satisfy the scienter pleading requirements of the PSLRA, given the context and limited nature of the misrepresentations at issue." *Id.* at 749. Similarly, in *Zucco Partners*, information that was "largely definitional" and not "especially prominent ... would not be immediately obvious to corporate management." *Zucco Partners*, 552 F.3d at 1001. In order to find scienter, the court would have had to

have found that management was aware that "a software development project had reached the 'post-implementation' stage or that computer engineers were working on software that did not qualify for 'internal use.' There is no indication that [these definitional differences] ... would be operationally visible to executives not intimately connected with the development process...." *Id.*

**■ *The Holistic Analysis.*** Finally, under *Tellabs,* core operations allegations "may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling in light of other explanations." *South Ferry,* 542 F.3d at 785. (citations omitted). This requires a court to engage in a holistic review of the complaint. "[T]he core operations inference can be one relevant part of a complaint that raises a strong inference of scienter.... Vague or ambiguous allegations are now properly considered as a part of a holistic review ..." *Id.* at 784. "Allegations that rely on the core operations inference are among the allegations that may be considered in the complete PSLRA analysis" because "the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Id.* Thus, the inference can be a plus factor, adding weight to other allegations and circumstances and giving rise to the necessary level of particularity.

In total, the Ninth Circuit made it clear that, while there are three categories of cases where the core operations inference may come into play, only in two of those circumstances is a core operations theory *sufficient* to establish scienter: when it would be "absurd" to suggest that management did not know about the facts that

make their statements allegedly false, and where the plaintiffs adequately pleaded facts that indicated actual knowledge of the disputed systems or operations. *See Zucco Partners,* 552 F.3d at 1000 (recognizing two exceptions to the general rule that the core operations inference alone is inadequate). Otherwise, the place of the core operations inference is in a *Tellabs* holistic review. Taken as one of many allegations in a complaint, courts need not close their eyes to management's inevitable exposure to core operations. *See id.* at 991 (engaging in a two-part process: first considering each separate allegation alone, then investigating whether holistic review could save the complaint).

## III. DISCUSSION: SOUTH FERRY'S COMPLAINT

Plaintiffs alleged that they had uncovered both direct and circumstantial evidence that created a strong inference that the individual defendants had acted with at least deliberate recklessness. By way of background, in the previous Order, the Court found that Plaintiffs adequately pleaded that (1) WaMu suffered technology problems affecting its ability to timely process and monitor loans after customers had locked in rates, (2) Optis was a failure and was never completely rolled out, and (3) WaMu's failure to integrate its different technology platforms created significant problems, including insufficient and inaccurate reporting of data critical to hedging operations. (MTD Order 27 (Dkt. No. 73).)[5] Plaintiffs also adequately pleaded that WaMu's technological capabilities were critical to its core operations. (*Id.* at 28.) Importantly, Plaintiffs adequately pleaded that Defendants' statements regarding WaMu's technology prob-

---

5. The confidential witness statements on which the Court based this conclusion are reprinted in Appendix A.

lems, balanced businesses, and hedging ability were materially false and misleading within the meaning of Rule 10b–5 (*Id.* at 22–23.) Because falsity was well pleaded, the Court may now investigate statements—even those that are true—that implicate Defendants' access to information within WaMu, and lead to a determination that Defendants acted with scienter.

None of the confidential witness statements implicates an individual Defendant directly.[6] Thus, these conclusions identify the problem that the individual defendants ought to have known about—not that they did, in fact, know about it. As the Court indicated previously, the confidential witness statements only suggest scienter if the core operations inference helps them to do so. (*Id.*) Thus, Plaintiffs' case against each individual Defendant depends on the permissible conclusions that may be drawn from the individual Defendants' statements, the core operations inference, and stock sales.[7]

■ Throughout this analysis, the Court is mindful that "the inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences.... Recall in this regard that [the] pleading requirements are but one constraint among many the PSLRA installed to screen out frivolous suits, while allowing meritorious actions to move forward." *Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499 (citations omitted). Vague and ambiguous allegations are properly considered, even under the PSLRA. *South Ferry,* 542 F.3d at 784. The Complaint simply must paint a cogent, compelling picture that the individual Defendants acted at least recklessly in assuring investors that WaMu could withstand the vagaries of the market. And as the Court describes below, as to Defendants Killinger, Casey, and Oppenheimer, the Complaint succeeds.

## A. Defendant Killinger

■ *Killinger's position at WaMu.* During the Class Period, Defendant Kerry K. Killinger ("Killinger") was WaMu's Chief Executive Officer and the Chairman of the company's Board of Directors. (Compl. ¶ 8 (Dkt. No. 54 at 5).) He was also a member of WaMu's Executive Committee and President's Council, which, the Plaintiffs allege, was "focused on operational efficiency, operational decision-making, and strategic execution." (*Id.*) Also, WaMu made public statements that assured the public that senior management remained informed: "Our goal is to ensure that our senior management has timely access to all material financial and non-financial information concerning our busi-

6. Compare the confidential witness statements in Appendix A, which describe serious flaws with the systems in the company but do not discuss any individual Defendant's behavior, with the "lone fact ... indicative of scienter" in *Zucco Partners.* There, a confidential witness "specifically report[ed] that he/she was directly ordered by [Defendant] in 2004 not to write down obsolete inventory because, according to [Defendant] ... writing down obsolete inventory would result in the Company's missing market expectations." *Zucco Partners,* 552 F.3d at 999. Here, no confidential witness statement implicates Defendants' direct knowledge of the system problems at WaMu, much less malfeasance in covering up those problems.

7. Plaintiffs had alluded to several Generally Accepted Accounting Principles ("GAAP") violations, claiming that these "violations" indicated scienter. The Court found, however, that Plaintiffs had not adequately pleaded the alleged GAAP violations with the requisite level of particularity. (MTD Order 37 (Dkt. No. 73).) The Ninth Circuit's opinion does not disturb this conclusion. Because there is no proper allegation that GAAP was ever violated, the Court need not now take the alleged violations into account when determining scienter.

ness." (Compl. ¶ 61 (Dkt. No. 54–1 at 33) (describing WaMu's 1Q:03 Form 10–Q).) During the Class Period, Killinger ran conference calls in which he discussed WaMu's technical systems and risk-management capacity in the home mortgage sector. It is primarily those statements that suggest scienter.

*Statements.* The statements that indicate Killinger's knowledge of WaMu's core operations are reprinted with contextual details in Appendix B. In summary, Killinger repeatedly assured the public that WaMu was adequately managing its risk, had successfully integrated its recent acquisitions, and was technologically capable of managing information flow. As before, Plaintiffs adequately pleaded that many of these statements were false. (MTD Order 21–23 (Dkt. No. 73).) Even so, the statements require the core operations inference to establish scienter because there is no allegation that Killinger was told of the systems problems, for example, or was alerted that WaMu's risk management was flawed. However, given Killinger's prominent position in the company and the tenor of his missives, the core operations inference—if available after *South Ferry*—allows the Court to infer that Killinger *must have known* that his mollifications about WaMu's hedging ability were dishonest. Defendants argue, though, that Plaintiffs cannot avail themselves of the core operations inference because their allegations fall short of the actual knowledge analysis, the absurdity analysis, and holistic review. But the Court does not agree, particularly because the Court is satisfied that Plaintiffs have adequately pleaded Killinger's actual knowledge.

Defendants argue that Plaintiffs have not pleaded with sufficient particularity that Killinger had actual access to information contradicting his statements that concerned pipeline hedging. (Def. Opening Br. 2–3 (Dkt. No. 171 at 7–8).) Plaintiffs

counter that "Defendants exhibited first-hand knowledge of, and sometimes direct involvement in, WaMu's risk-management operations.... Defendants spoke with personal knowledge when providing false or misleading assurances regarding WaMu's systems challenges." (Pl.'s Opening Supplemental Opp. 11–12 (Dkt. No. 173 at 16–17).) In other words, Plaintiffs' argument is that Killinger's statements *themselves* suggest that he had actual knowledge of WaMu's systems capacity and hedges: the Court can infer at least deliberate recklessness because Killinger repeatedly told the investing public "I know what I'm talking about." (Pl.'s Repl. 11 n.6 (Dkt. No. 176 at 15).)

The Court finds analogy in *Institutional Investors Group v. Avaya,* 564 F.3d 242 (3d Cir.2009). There, focused analyst questions about unusual discounting, in conjunction with the CEO's unequivocal statements indicating his knowledge of the company's systems, established a strong inference of scienter. The possibility that the CEO "was ignorant is not necessarily exculpatory. Even if [he] were not aware of the full extent of the unusual discounting, or the entirety of the other circumstances alleged by Shareholders, he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials ... would mislead investors." *Avaya,* 564 F.3d at 270. Similarly, on remand, the Seventh Circuit in *Tellabs* reminded courts that notice of a risk is often enough: "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 704 (7th Cir.2008). And in *Applied Signal,* the Ninth Circuit held senior management accountable for information about which they claimed to have superior knowledge: "Once defendants chose to tout the company's backlog, they were bound to do so in a

manner that wouldn't mislead investors as to what the backlog consisted of." *Applied Signal,* 527 F.3d at 987. *See also Oracle,* 380 F.3d at 1231 (CEO described his company's, and his own, superlative access to sales data).

The Court finds that Killinger represented that he had access to the information that underpinned his sunny announcements about WaMu's risk-management capabilities. This is enough, under *South Ferry,* for the Court to find that Killinger had actual knowledge of the systems integration and of the hedging capacity of his company.

First, Killinger discussed WaMu's technology and integrations with a high degree of specificity on more than one occasion. For example, Killinger admitted to investors in July of 2004 that "[w]e did not complete integration of these operations during the refi[nancing] boom, because we decided at the time that the software systems we were developing internally would provide a better road to conversion. So, we did not execute on a long held practice of fully integrating acquisitions unto [*sic*] a common systems platform in a short period of time." (Compl. ¶ 45 (Dkt. No. 54–1 at 19–20).) This statement demonstrates that Killinger knew about WaMu's systems capacities. He also admitted that the integration of the systems was below-par: "[W]hen we did undertake this integration effort, we did not execute as well as we should have. We had some technology and systems challenges which became larger than anticipated ..." (*Id.*) Likewise, in September 2003 he demonstrated knowledge of WaMu's systems and its flaws by stating that "several mortgage banking process system challenges ... came to light as a result of the spike in interest rates in late July and August ..." (*Id.* ¶ 74 (Dkt. No. 54–2 at 7).) In October of 2003, he repeated that "we had to put the final integrations of those acquisitions

a bit more on the back burner" to respond to the refinancing boom. (*Id.* ¶ 79 (Dkt. No. 54–2 at 13).) And more importantly, Killinger repeatedly reassured investors— in the face of *direct questioning* about the status of WaMu's technological woes—that these system challenges were fixed, that WaMu had taken "immediate steps" to address them by putting a "SWAT team of folks" on the problems, and that, now, the company was "back on track" from a technological standpoint. (*See id.* ¶¶ 74, 77, 79, 96 (Dkt. No. 54–2 at 7, 10, 13, 23).) All of these statements evidence that Killinger had actual knowledge of the integration of the technological systems within WaMu.

Second, Killinger represented repeatedly that he was confident about WaMu's risk management—and, most importantly, that he had adequate information to make those predictions. He admitted the crucial nature of the risk-management endeavor, and represented his own knowledge of and confidence about WaMu's structures, when he said that "credit and risk management practices must infuse the entire operating culture of the company, and I believe we've made good progress in this area." (*Id.* ¶ 86 (Dkt. No. 54–2 at 18).) Killinger asserted that "we carefully manage all of the various portfolios we're in and we watch the national housing market very carefully." (*Id.* ¶ 59 (Dkt. No. 54–1 at 28).) And again: "We do continue to manage our credit risks function very carefully. I think we continually improve all our metrics and monitoring and put in some terrific talent that is staying right on top of all this." (*Id.* ¶ 73 (Dkt. No. 54–2 at 7).) And again: "[W]e have developed sophisticated risk management tools and processes which have allowed us to perform very well in a volatile interest rate environment. This has given me a great deal of comfort in our management of risk overall." (*Id.* ¶ 86 (Dkt. No. 54–2 at 18).) Most importantly, Killinger personally represented

that that the company's MSR-related and pipeline risks were "integrated" in April and May of 2004. (*Id.* ¶¶ 106, 114 (Dkt. No. 54–2 at 27, Dkt. No. 54–3 at 5).) In May of 2004, he went so far as to say "there is just one source to do all the hedging, and the portfolios are all pulled together." (*Id.* ¶ 114 (Dkt. No. 54–3 at 5)); *compare Oracle,* 380 F.3d at 1231 (CEO announced that "all of our information is in one database. We know exactly how much we have sold in the last hour around the world.").

Thus, Killinger maintained that he knew what he was talking about. He displayed an intimate knowledge of WaMu's information delivery, risk-management structure, and hedging capacity, and he represented to investors that he had all of the information necessary to make accurate predictions about WaMu's risk. This is sufficient to satisfy the actual knowledge analysis and allows the Court to infer scienter. If he did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all.

*Stock sales.* Plaintiffs also point to Killinger's stock transactions, which they allege were suspiciously timed. Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter. *Silicon Graphics,* 183 F.3d at 986. In order to be "unusual" or "suspicious," the transactions must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* The Court investigated Killinger's stock sales in its previous MTD Order, and found that Killinger's stock trades were generally unsuspicious. (MTD Order 33–34 (Dkt. No. 73).) However, the Court also found that Killinger had not brought forth any evidence to negate the inference of scienter; so the evidence did not permit an inference in either direction. (*Id.*) As a consequence, the stock sales may be considered in *Tellabs* holistic review.

*Holistic Review.* The Court need not investigate whether it would be absurd to think that Killinger was unaware of the flaws in his company's risk management. This is because, even if the allegations regarding Killinger's actual knowledge of WaMu's systems were insufficient standing alone, *Tellabs* holistic review requires the Court to uphold the Complaint. Taking into account the context, the confidential witness statements, Killinger's prominent position within the company, his stock sales, and, most of all, his repeated public representations that WaMu was confident about its risk management, Plaintiffs have adequately pleaded that Killinger knew (or was deliberately reckless in not knowing) that something was terribly wrong with WaMu's hedging strategy. In the face of a large number of recent acquisitions, consistent systems problems, and technological snafus, it was at least actionably reckless for Killinger to reassure investors that he had WaMu's risk management under control.

**B. Defendant Casey**

*Casey's Position at WaMu.* During the Class Period, Defendant Thomas W. Casey ("Casey") was WaMu's Chief Financial Officer and Executive Vice President. (Compl. ¶ 10 (Dkt. No. 54–1 at 6).) He was, like Killinger, a member of the Executive Committee and the President's Council, and participated in conference calls and public appearances to discuss WaMu's fiscal health. (*Id.*)

*Statements.* Casey's statements that indicate scienter are reprinted in Appendix C. The Court finds it unnecessary to repeat the legal framework described above; for the same reasons, the Court finds that the allegations in the Complaint are suffi-

cient to determine that Casey was in possession of actual knowledge about WaMu's risk.

Like Killinger, Casey repeatedly represented to the investing public that he was informed. He discussed his actual knowledge of WaMu's hedging and risk management: "We continue to actively monitor and collectively manage our sensitivity to changes in interest rates and still feel confident with that guidance." (*Id.* ¶ 67 (Dkt. No. 54–2 at 3).) More, in October 2003: "With regard to your comment about changes in interest rates and the impact it will have on the market, we consistently and [*sic*] have been talking about this for quite some time, that we're preparing for this …" (*Id.* ¶ 68 (Dkt. No. 54–2 at 4).) Like Kerry, he also asserted his knowledge of the flawed systems. "We have identified these [operational problems] and implemented the appropriate measures to address them.… We have addressed these problems through improved information flows, better tracking of loan commitments and stronger oversight. Performance has since improved, and we are returning to normal conditions." (*Id.* ¶ 79 (Dkt. No. 54–2 at 12).) He repeated this same sentiment two months later. (*Id.* ¶ 87 (Dkt. No. 54–2 at 18).) In the face of his own representations that he had the necessary knowledge, it was at least actionably reckless to say that "the changes we have made over the past year in our interest rate risk management processes and capabilities … have helped us to significantly reduce the company's sensitivity to interest rates." (*Id.* ¶ 107 (Dkt. No. 54–3 at 1).)

Casey's statements demonstrate actual knowledge of WaMu's technology, risk management, and integration. This is enough to trigger the core operations inference, such that the Court may infer that Casey knew that WaMu's risk management capacity was not as healthy as he was representing.

*Stock Sales.* The Court previously found Casey's stock sales to be unsuspicious. (MTD Order 34 (Dkt. No. 73).)

*Holistic Review.* Given Casey's prominent position in the company, his stock sales, his repeated public assurances that WaMu was adequately hedged, and his assurances that he had the information necessary to make those statements, there is enough in the Complaint that the inference that Casey knew that all was not well at WaMu, contrary to his statements, is more "cogent and compelling" than competing innocent inferences. *South Ferry,* 542 F.3d at 785.

## C. Defendant Oppenheimer

*Oppenheimer's Position at WaMu.* Defendant Deanna W. Oppenheimer ("Oppenheimer") was, during the Class Period, President of the Consumer Group, and a member of the Company's executive management team. (Compl. ¶ 11 (Dkt. No. 54–1 at 6).) She was responsible for WaMu's mortgage banking reporting segment. (*Id.*) She was a member of the President's Council, and also made public representations about the state of WaMu's risk management.

*Statements.* Oppenheimer's statements that indicate scienter are reprinted in Appendix D. Like Casey and Killinger, Oppenheimer represented that she had access to the disputed knowledge. To wit, she told investors in 2004 that WaMu had "nine different loan origination systems in our mainstream home lending channel," and recognized that WaMu had not been in a position to integrate its acquisitions. (*Id.* ¶ 89 (Dkt. No. 54–2 at 19).) This statement displays knowledge of the systems failures that Plaintiffs allege was the fount of WaMu's incapacity to manage risk. Moreover, she represented, like Killinger and Casey, that she had the infor-

mation necessary to make predictions about WaMu's capacity to handle interest rate fluctuations: "[W]e are managing our expenses very aggressively during this timeframe, particularly in the mortgage business.... We are looking at our whole balance sheet in a very sophisticated fashion, with a number of various hedges and instruments that we are using to be able to hedge and be ready for these types of environments." (*Id.* ¶ 115 (Dkt. No. 54–3 at 6).) Again, Oppenheimer made statements sufficient to reassure investors not only that WaMu was managing its risk— she also represented that she had sufficient information to know about that risk. And, under the actual knowledge analysis, this allows the Court to infer that Oppenheimer must have known, or was deliberately reckless in not knowing, that WaMu was inadequately hedged.

*Stock Sales.* The Court previously determined that Oppenheimer's stock sales "could support an inference [of scienter] drawn from other circumstantial evidence." (MTD Order 35 (Dkt. No. 73).)

*Holistic Review.* Again, there is enough in the Complaint, holistically, to support a cogent inference that Oppenheimer was at least deliberately reckless in making soothing statements about WaMu's risk. While Oppenheimer made fewer statements than either Killinger or Casey, she spoke specifically about the company's information flow, describing the nine different loan origination systems. In the face of this admitted technological deficiency, she nonetheless represented to investors that WaMu could manage its risk. The Court finds that, given her prominent position in the mortgage lending department, her representation that she had access to the information necessary to make accurate predictions about WaMu's risk, and her stock sales, the Complaint, read holistically, alleges enough to support a strong inference of scienter. Oppenheimer had to have known that the company's mortgage risk management was flawed.

### D. Defendants Longbrake, Vanasek, and Chapman

Plaintiffs do not point to any statements by Defendants Longbrake, Vanasek, or Chapman. In the absence of any statements, the Court is unable to find the data that supported a core operations inference for Oppenheimer, Casey, and Killinger— namely, that any of these Defendants had access to the information that made their nonexistent statements false. As before, the Motion to Dismiss is therefore GRANTED as to these individual Defendants.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Consolidated Amended Complaint (Dkt. No. 65) is DENIED IN PART and GRANTED IN PART. All claims against Defendants Longbrake, Vanasek, and Chapman are DISMISSED. Claims against Defendants Killinger, Casey, and Oppenheimer may proceed.

### APPENDIX A: CONFIDENTIAL WITNESS STATEMENTS

| CW# ¶ | Job title | Time/location employed at WaMu | Job responsibilities | Allegations |
| --- | --- | --- | --- | --- |
| 1 ¶¶ 48, 51 | Loan Consultant | 4/01–8/04 Jacksonville, FL | loan processing and closing | Before Optis, closed 40–50 loans/month; after Optis, closed about 20/month |

| | | | | |
|---|---|---|---|---|
| | | | | Despite problems, was instructed to keep accepting loan applications regardless of likelihood of approval |
| 2 ¶ 48 | Closing Coordinator | 4/03–1/04 Cincinnati, OH | loan closing | Optis slowed loan processing; loan rates often locked at or after 90 days; before Optis, closed 4–5 loans/day, but after Optis, the number dropped significantly and some days none at all |
| 3 ¶ 49 | VP Business Strategy/ Program Mgr. | 6/00–4/04 Seattle, WA | worked on technology programs for WAMU's consumer lending operations and emerging market strategies for risk management requirements | Did not have technological systems to integrate data needed to make calculations in the capital market or secondary market arena; Optis was supposed to help, but lacked capacity |
| | | | | Optis only partially deployed by mid–2003, almost one year late, then withdrawn because of capacity issues |
| 5 ¶ 50 | Loan Officer | | | WaMu was so far behind in its loan processing that it consistently failed to send loan packages to customers on a timely basis |
| 6 ¶ 50 | VP | 2003–6/04 Seattle, WA | in charge of underwriting administration | WaMu's loans contained errors and problems because of lack of quality control in loan processing; Optis was a major part of WaMu's problems because could not support the necessary productivity; Optis repeatedly missed deadlines |
| 7 ¶¶ 50, 51 | Loan Officer | 9/01–3/04 Jacksonville, FL | | Had to turn off phone for 3–4 months at the loan center to delay accepting new loan applications, due to Optis and inability to process pending loan applications |
| | | | | Despite problems, was instructed to keep accepting loan applications regardless of likelihood of approval, creating flood of loan applications |
| 9 ¶ 52 | IBM Consultant | 11/02–11/03 Fullerton, CA | worked on WAMU's conversion to Optis | Although Optis supposed to fix the problem of delays in loan closings, it made things worse because it required WaMu to |

| | | | | transfer information between systems |
|---|---|---|---|---|
| 11 ¶ 53 | VP and Project Manager | 8/00–3/04 | initially hired to be Optis release manager for WAMU's correspondent channel | Optis poorly designed and could not support too many concurrent users |
| | | | worked on strategic projects | Optis failed to upload systems correctly and was not being maintained by WaMu's operational centers |
| 12 ¶ 54 | VP Portfolio Retention | 12/02–3/04 Seattle, WA | reported rate lock data to capital markets group | Accurate reporting of data was a problem because of technological issues, including Optis and multiplicity of platforms |
| | | | | Attended weekly teleconference meetings discussing technology, rate lock and pipeline challenges |

### APPENDIX B: DEFENDANT KILLINGER'S STATEMENTS

| ¶ | Details | Statement |
|---|---|---|
| ¶ 45 | Def. Killinger, during conference call on July 22, 2004 | "Let me remind everyone, that we assembled a large mortgage lending franchise through a series of acquisitions in a relatively brief period. We acquired P & C [sic] Mortgage, Fleet Mortgage, HomeSide Lending and North American Mortgage. The refinancing boom hit and we had the opportunity to derive significant profits from these acquisitions. We did not complete integration of these operations during the refi boom, because we decided at the time that the software systems we were developing internally would provide a better road to conversion. So, we did not execute on a long held practice of fully integrating acquisitions unto [sic] a common systems platform in a short period of time. . . ." |

"[A]nd quite frankly, when we did undertake this integration effort, we did not execute as well as we should have. We had some technology and system challenges which became larger than anticipated, in other words, we did not execute our normal game plan. That then delayed building the kind of mortgage business we want to have; One like our retail banking business that is high-volume, low-cost, scalable and focused. This integration has simply taken too long. . . ."

"Last call, it became apparent to me that the management teams leading our mortgage banking group was not making satisfactory progress in addressing these challenges. So, we made some big changes. We replaced several people and asked our entire executive team to step up and help assess the situation. We discovered that the problems in the mortgage banking unit were substantial."

"Let me conclude with a summary of our outlook for the mortgage operations. We have a huge amount of work ahead of us over the next several quarters to get where we want to

| | | be. There are some quick fixes but there are some things that will take time." |
|---|---|---|
| ¶ 56 | Def. Killinger, conference call on April 16, 2003. | WaMu will be in a "stronger position when the current interest rate environment changes." |
| ¶ 59 | Def. Killinger, CNBC interview, on April 16, 2003. | "[W]e carefully manage all of the various portfolios we're in and we watch the national housing market very carefully. . . . [W]e have a very balanced business model one in which when housing's doing strong [sic], we get high levels of loan originations and gains on sale of those loans and so forth. When interest rates go up and we start to get a slowdown in housing, then we will have a real benefit of the servicing portfolio that we have of loans that we service for others, and that income should really kick in. . . ." <br><br> "Part of our business does better when interest rates are going up, part of it does better when interest rates are going down. And those really do a nice job of offsetting each other. And that's given us this very, very strong secular growth rate over the last many years and relatively little volatility. Now, in addition to the natural business hedge, we do a certain amount of financial hedging just to be sure that we . . . smooth out those peaks and troughs a little bit more. But the kind of financial hedging we do are straight over tackle. We normally use [ ] either securities or certain derivatives just to balance out the interest rate risk." |
| ¶ 66 | Def. Killinger, in WAMU's July 15, 2003 press release discussing 2Q:03 financial results. | "Building on first quarter's momentum, Washington Mutual's balanced business model continued to deliver strong results in the second quarter." |
| ¶ 73 | Def. Killinger, during a Lehman Brothers conference, on Sept. 9, 2003. | "We do continue to manage our credit risks function very carefully. I think we continually improve all of our metrics and monitoring and put in some terrific talent that is staying right on top of all this." |
| ¶ 74 | Def. Killinger, during a Lehman Brothers conference, on Sept. 9, 2003. | "[S]everal mortgage banking process system challenges . . . came to light as a result of the spike in interest rates in late July and August. And it's created some imprecision in the matching of our loan commitments and pipeline hedging activities. . . . Now, we took immediate steps to address any of the operating challenges and are back on track. But fortunately, despite all this, our balanced business model has other parts, which performed very well in this interest rate environment. Because rates have risen, for example, we experienced a large recovery in the value of our mortgage servicing rate assets . . . . And while a substantial portion of that benefit, of course, is offset with some of the hedging activities that we do, we do expect a recovery to outpace the loss on the derivatives. . . . So you're going to be seeing our retained portfolio grow fairly significantly. . . . And lastly, as we discussed in the first and second quarters, we took proactive steps to reposition our balance sheet for a rising interest rate environment and we're now in a position to recognize gains in the third quarter. So as we look ahead, we have been preparing for this eventuality for quite some time. . . . So overall, as I look at the impact of these changing interest rates on Washington Mutual, I believe |

| | | |
|---|---|---|
| | | that our balanced business model is performing just as anticipated." |
| ¶ 77 | Def. Killinger, in WAMU's Oct. 21, 2003 press release discussing 3Q:03 financial results. | "We have identified the issues that led to these challenges [net loss from mortgage loans] and have implemented measures to address them." |
| ¶ 79 | Def. Killinger, during conference call on Oct. 22, 2003. | "I think, in terms of operational measures, as soon as we saw that there were—was an inconsistency of the data coming in between the rate locks and what we needed to do for hedging, we jumped on that immediately, put in a very large SWAT team of folks to get their arms around things. They got that stabilized very quickly, and then we immediately implemented a variety of measures to be sure that that would not happen again. We are very confident at this point in time, that the flows of information are accurate, and that the financial risk that we encountered early in the third quarter is taken care of at this point. . . ." <br><br> "And I think, again, just stepping back for just a moment, we went through a period of rapid acquisitions . . . Because we needed to respond to the refinancing boom, we had to put the final integrations of those acquisitions a bit more on the back burner. And now that the refinancings are slowing down, we are really going to tune up and dial up the efforts to complete all of the final operational integrations coming out of those acquisitions, and getting the true efficiencies that come out of it. . . ." <br><br> [In response to questioning regarding integration of HomeSide lending onto a single platform] I think we continue to be in . . . the final process of evaluating all of both the origination and the servicing platforms that we want to ultimately have. Particularly in light of our organizational approach that we want to have, of having as seamless as we can going over to what we're doing in the banking side of the business, as well. So we're going through those final evaluations. I will say, in general, you have heard us talk about over time that the Optis origination system has been one that has been phased in. It has been very successful in certain parts of getting a standardized information screen out to our originators and so forth. . . ." |
| ¶ 86 | Def. Killinger, during WAMU's Dec. Investor Day Conference, on Dec. 9, 2003. | "Under the leadership of Bill Longbrake, we have developed sophisticated risk management tools and processes which have allowed us to perform very well in a highly volatile interest rate environment. This has given me a great deal of comfort in our management of risk overall. . . ." <br><br> "[C]redit and risk management practices must infuse the entire operating culture of the company, and I believe we've made good progress in this area." |
| ¶ 96 | Def. Killinger, during conference call on January 21, 2004 | "Nearly every one of those [technology write-offs] were related to . . . our mortgage fulfillment operation. Our senior management team has completed its end to end diagnostic review of the mortgage business and expects significant improvement in efficiency as the year progresses. This will be the result of further elimination of redundant operations, improvements in technology performance and streamlining of business process." |

| | | |
|---|---|---|
| ¶ 106 | Def. Killinger, during WAMU's 1Q:04 conference call, on April 20, 2004. | "Another point that sometimes gets overlooked is the excellent progress we've made in repositioning the balance sheet over the past year, and significantly reducing our exposure to the possibility of rising interest rates.... I'll just say that from an interest rate sensitivity standpoint, we are in a much stronger position today that I have ever seen since I joined the company about 20 years ago...."<br><br>"[W]e have fully integrated our MSR and mortgage pipeline hedging activities and upgraded the capabilities of our capital market and treasury areas under Tom Casey. This has led to better execution than ever before." |
| ¶ 114 | Def. Killinger, during a Lehman Brothers conference, on May 12, 2004. | "The question was, hedging for our mortgage-related products, both the pipeline and the MSR, which are the important parts, will those be from a single source when the systems are integrated? I think a fair way to respond to that is that for those purposes of hedging, we integrated the essential information quite some time ago. So that there is just one source to do all the hedging, and the portfolios are all pulled together...."<br><br>"The various platforms that I was talking about is primarily how we have to interact with the customer out of point-of-sale where I may have had a salesforce [sic] that came from one acquisition from another, had different products in areas where it was a bit disjointed. There were two loan servicing systems that we had for part of our customers on one and part of the other. But in terms of the financial information coming off those to do our mortgage servicing valuation and hedging, we have always had those pulled together."<br><br>"Now, we did run into a situation last year in the third quarter when the loan origination systems were not connected as well as what we thought they were, and there we ended up with some hedging issues out of our pipeline. And once we saw that, we got all over it, and I have not had any issues come out of that since then." |

## APPENDIX C: DEFENDANT CASEY'S STATEMENTS

| | | |
|---|---|---|
| ¶ 56 | Def. Casey, during WAMU's 1Q:03 conference call, on April 16, 2003. | WAMU was taking necessary and proper steps so as to account for "eventual changes in [the] interest rate environment."<br><br>"At this time, we are focused on balancing the demands of today while positioning the company for the eventual change in interest rate environment. And our balanced business model will provide the leverage to continue to grow market share in a changing environment."<br><br>"As part of the company's ongoing interest rate risk management program and positioning of the balance sheet for future rising rates, we repositioned certain acts and liability hedging during the quarter.... We believe this was a prudent step that will help us position for the future rise in interest rates." |
| ¶¶ 57–58 | Def. Casey, during the Q & A session | "We feel very good about our hedging activities for mortgage servicing rights." |

| | | |
|---|---|---|
| | of WAMU's 1Q:03 conference call, on April 16, 2003. | |
| | | "Again, we're very confident that our risk management is working here, and when you see the offset here, I think we're feeling very good about where we are." |
| ¶ 67 | Def. Casey, during WAMU's 2Q:03 conference call, on July 16, 2003. | "Our tremendous second quarter results demonstrate the continued successful execution of our business strategy.... All parts of our business are delivering according to plan. And in spite of an operating environment that presents a diverse mix of challenges and opportunities, our balanced business model allowed us to achieve record earnings.... Looking ahead, keep in mind that the servicing portfolio can be expected to contribute significant earnings when the interest rates eventually do rise.... We remain focused on balancing the demands of today while positioning the company for the eventual change in interest rates.... Home Loans is prepared for rapid changes in the interest rate environment. We are confident that our balanced business model will provide the flexibility to grow market share in [a] changing environment.... We continue to actively monitor and collectively manage our sensitivity to changes in interest rates and still feel confident with that guidance." |
| ¶ 68 | Def. Casey, during the Q & A session of WAMU's 1Q:03 conference call, on July 16, 2003. | "With regard to your comment about changes in interest rates and the impact it will have on the market, we consistently and have been talking about this for quite some time, that we're preparing for this. This is not new news .... We have been stressing our environment to anticipate this kind of shortfall, so that the team has the plans in place and triggers in place to anticipate slowdowns in volumes....We feel very good about that, but the forecast for the slowdown of the market it not new news. We've been anticipating that for quite some time." |
| ¶ 78 | Def. Casey, during WAMU's 3Q:03 conference call, on Oct. 22, 2003. | "Now let me provide some color on the market-driven issues that contributed to the loss from mortgage loans. These fell into two main areas—first, the extreme volatility in interest rates down inefficiencies into the market for a period of time. As we've seen with many other lenders, this situation impacted our ability to effectively hedge the pipeline. As you'd expect, a component of our hedging strategy assumes that a certain percentage of loans in our pipeline will not be funded. However, during the rate spike, we experienced a tremendous decrease in the percentage of loan fallout, as consumers rushed to close their loans at the lower rates they had locked in. Accordingly, there were times in the quarter when we incurred losses, as we repositioned the hedge in response to significant interest rate movements." |
| 6 ¶ 79 | Def. Casey, during WAMU's 3Q:03 conference call, on Oct. 22, 2003. | "Now, you'll recall that in early September, we also said that operational problems in our home loan business would contribute to third-quarter results. As Kerry mentioned earlier, we have identified these issues and implemented the appropriate measures to address them. They were timeliness of information flows, due to the tremendous volume in our loan fulfillment area. This resulted in certain loan commitments not being reflected in our hedging profile on a timely basis...." |

| | | |
|---|---|---|
| | | "The second item that affected us was that during the apex of the third-quarter volatility, many of the loans in the pipeline were not funded within their specified rate lock period. . . . We have addressed these problems through improved information flows, better tracking of loan commitments and stronger oversight. Performance has since improved, and we are returning to normal conditions." |
| 7 ¶ 87 | Def. Casey, during WAMU's Dec. Investor Day Conference, on Dec. 9, 2003. | "Kerry [Killinger] mentioned we also experienced operational challenges in our own mortgage business in the third quarter. As we stated on several occasions, we have identified the issues that lead [sic] to these problems and have implemented the appropriate measures to address them." |
| 8 ¶ 97 | Def. Casey, during WAMU's 4Q:03 conference call, on Jan. 21, 2004. | "Overall we remain very comfortable with our valuation model for mortgage servicing rights, and our related derivative hedging continues to perform as expected." |
| | | "Now, the refinance activity has slowed. We have accelerated our integration activities as well as our efforts to drive down our mortgage cost structure overall. As we progressively gain efficiencies from the integrations and other cost reduction efforts in the mortgage area, we should see our margin on gain from mortgage sales improve as the year progresses." |
| 9 ¶ 107 | Def. Casey, during WAMU's 1Q:04 conference call, on April 20, 2004. | "Our risk management function performed extremely well again this quarter, and we remain very confident in our ability to manage the MSR asset effectively in any interest rate environment. The steps we've taken to fully integrate our MSR and mortgage pipeline hedging activities have provided us with more effective and less-expensive hedging execution. . . ." |
| | | "The changes we have made over the past year in our interest rate risk management processes and capabilities, and the actions we've taken over the last couple of quarters to adjust our balance sheet position and optimize the management of our MSRs have helped us to significantly reduce the company's sensitivity to interest rates. . . ." |
| | | "Bottom line, we feel the company is in a strong position to withstand changes in rates." |

## APPENDIX D: DEFENDANT OPPENHEIMER'S STATEMENTS

| | | |
|---|---|---|
| 1 ¶ 89 | Def. Oppenheimer, during the Ragen MacKenzie 23d Annual Investment Conference, on May 18, 2004. | "As highlighted earlier, we have not been in a position to fully integrate the system to the mortgage companies that we acquired in 2000 and 2001. The end of the refinance wave now affords us that opportunity, and this slide shows you that our point-of-sale origination system, Optus.1 [sic ], is now rolled out to the vast majority of our systems. . . ." |
| | | "We currently have nine different loan origination systems in our mainstream home lending channel." |
| 2 ¶ 115 | Def. Oppenheimer, during the Lehman Brothers Financial Services conference, May 12, 2004. | "[E]ssentially what we are doing is we are measuring—we are managing our expenses very aggressively during this timeframe, particularly in the mortgage business, where we see seeing [sic ] those volumes in the mortgage business come down significantly. We are looking at our whole balance sheet management in a very sophisticated fashion, with a number of |

various hedges and instruments that we are using to be able to hedge and be ready for any of those types of environments. And we think we're as well positioned as we have ever been . . ."